UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| CATHY RANDOLPH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-271-MJD |
| | ) | |
| CHATTANOOGA HOUSING AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Cathy Randolph ("Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant Chattanooga Housing Authority ("Defendant" or "CHA") for terminating her participation in its Housing Choice Voucher Program (the "Program"). Plaintiff contends that, in terminating her participation, Defendant violated her right to due process under the Fourteenth Amendment of the United States Constitution and her rights under the United States Housing Act of 1937. Currently before the Court is Defendant's motion for summary judgment [Doc. 34], which is fully briefed [Doc. 43 (Plaintiff's response); Doc. 45 (Plaintiff's response brief); Doc. 48 (Defendant's reply)], together with the parties' Joint Statement of Undisputed Material Facts [Doc. 46 ("Joint Statement")]. Also before the Court is Defendant's Omnibus Motion in Limine [Doc. 49]. The Court conducted a hearing on both motions on September 29, 2026 (the "Hearing"). Plaintiff orally responded to Defendant's motion in limine during the Hearing. Both motions are now ripe for the Court's consideration. As set forth below, the Court will grant Defendant's motion for summary judgment in full and deny Defendant's motion in limine as moot.

## I. BACKGROUND

The following statement reflects the facts that the Court finds are material to Defendant's motion for summary judgment. Unless otherwise indicated, these facts are taken from the Joint Statement [Doc. 46] and from counsel's respective representations during the Hearing. Whether from the Joint Statement, the Hearing, or otherwise, the Court finds the following material facts are not in dispute.

Plaintiff was, at all times relevant to this dispute, a participant in the Program, through which Defendant provided her with a subsidy to pay rent at certain pre-approved rental units [Doc. 46 at Page ID # 865]. Defendant considered Plaintiff to be disabled and therefore approved her to have a 24-hour "live in aide" and provided her a subsidy for a two-bedroom apartment, with the extra bedroom designated for the live-in aide.

In October 2020, Plaintiff submitted paperwork designating her son, Brandon Linen, as her live-in aide, and writing "N/A" in the section identifying whether anyone in the home was working [Doc. 1-4 at Page ID # 36; Doc. 46 at Page ID # 865]. It is undisputed that, while designated as Plaintiff's live-in aide, Mr. Linen worked outside the home and was unavailable for 24-hour care services [Doc. 46 at Page ID # 865]. In October 2021, Plaintiff advised Defendant that she wanted to remove Mr. Linen as her live-in aide [Doc. 1-6 at Page ID # 40]. On February 16, 2022, however, Plaintiff submitted paperwork adding Mr. Linen back to her household and re-designating him as her live-in aide [Doc. 1-7 at Page ID # 41]. Plaintiff reaffirmed that designation in August 2022, again writing "N/A" in the portion of the paperwork that asked whether any member of the household was working [Doc. 1-8 at Page ID # 43–44].

On July 17, 2023, Plaintiff submitted paperwork adding her cousin (Alexis McDermott) and Ms. McDermott's two minor children to the household, and requesting that Ms. McDermott

be designated as her 24-hour live-in aide [Doc. 1-13; Doc. 1-14]. She also listed Mr. Linen as a member of the household, writing that he was "already on [the] list." [Doc. 1-13]. It is undisputed that Ms. McDermott was employed at the time, but worked remotely. It is also undisputed that Plaintiff did not report Ms. McDermott's income [Doc. 46 at Page ID # 865].

On August 3, 2023, Plaintiff signed a lease for a new apartment using her voucher under the Program [Doc. 1-15]. On September 15, 2023, Plaintiff submitted a Personal Declaration Questionnaire (the "September 2023 PDQ") listing Mr. Linen, Ms. McDermott, and Ms. McDermott's two children as the occupants of the household [Doc. 1-16]. The September 2023 PDQ also lists Ms. McDermott as the live-in aid, reflects that income information for Plaintiff and Ms. McDermott is "N/A," and appears to have disclosed Mr. Linen's income by way of an attachment [*id.* at Page ID #64–66]. About a month later, in October 2023, Plaintiff submitted paperwork removing Mr. Linen as an occupant [Doc. 1-17]. This form did not make any changes to Ms. McDermott's or her children's continuing status as occupants of the household or Ms. McDermott's designation as Plaintiff's live-in aide. Thus, at all times up to and including October 2023, Plaintiff represented that she had a 24-hour live-in aide who did not generate income from outside the home.

On April 11, 2024, Defendant sent Plaintiff a letter advising of a potential issue regarding unreported income and requesting Plaintiff's presence at a meeting less than two weeks later:

> During an investigation of your household's income, it has been determined by HUD that you or members of your household have income that was not or has not been reported, or was reported late to [Defendant]. The source of this income includes, but is not limited to, Comprehensive Logistics and Blue Cross Blue Shield.[1]

[1] It is undisputed that Mr. Linen earned income from Comprehensive Logistics and Ms. McDermott earned income from Blue Cross Blue Shield.

> Your attendance at a hearing on Monday, April 22, 2024, at 10:15 AM is requested to discuss this matter further. The meeting will take place at 801 N. Holtzclaw Ave. Please bring any income verification you would like reviewed during your appointment.
>
> If you are unable to attend this meeting, please contact me as soon as possible [at phone number and email address provided].

[Doc. 1-18 (the "April 11 Letter")]. The April 11 Letter was signed by Fraud Investigator Sarah Grace Pennington.

During the requested meeting on April 22, 2024, Plaintiff revealed that Ms. McDermott had never actually moved into the apartment referenced in the August 2023 lease, or into any other apartment with Plaintiff [Doc. 46 at Page ID # 866]. Plaintiff then completed another Change of Family Composition Form, removing Ms. McDermott and her two children as occupants of the household [Doc. 1-19]. On that form, Plaintiff wrote that they "changed mind due to bugs/apt conditions" [*id.* at Page ID # 73].

On April 29, 2024, Defendant presented Plaintiff with a proposed repayment agreement, which provides that Plaintiff owes $12,251 "due to my failure to report all household income in accordance with the requirements of the CHA housing program from which my housing assistance is derived." [Doc. 1-21 at Page ID # 75]. The repayment agreement required Plaintiff to pay $10,252 on or before July 1, 2024, followed by 12 monthly payments of $173 each [*id.*; *see also* Doc. 1 at Page ID # 6]. Plaintiff refused to sign the repayment agreement [Doc. 1 at Page ID # 6].

On April 30, 2024, CHA sent Plaintiff a letter notifying her that she would be terminated from the Program effective May 31, 2024:

> Please be advised that it has come to the attention of [CHA] that you or a family member has violated one or more of the Family Obligations, which are grounds for termination from the Housing Choice Voucher program. Effective **5/31/2024** CHA will terminate the current Housing Assistance Payment (HAP) contract. We will not issue a voucher to get into a new HAP contract nor provide relocation assistance under portability. You are terminated for the reason(s) checked below:

. . . .

X Failure to settle any debt owed[2]

. . . .

X Fraudulent Act – Unreported Income

. . . .

> If you disagree with this decision, you have 15 days from the date of this letter to request, in writing, an informal hearing. **<u>The appeal hearing form is on our website at www.chahousing .org. You can download and print a copy and then fax, mail or email it to our office</u>**. If you request a hearing, you may choose to be represented by counsel, at your expense, and you may produce evidence and/or witnesses on your behalf and cross-examine other witnesses. If you do not request a hearing within the time period indicated, we will assume that you agree with this decision and the termination will be enforced as indicated.

[Doc. 1-20 (the "Termination Notice") (emphasis in original)].

Plaintiff immediately submitted a Request for an Informal Appeals Hearing [Doc. 1-22]. When asked to "state the reason you are requesting an appeal hearing for the denial of rental assistance," Plaintiff wrote that she did not agree with the "amount of rent being charged" [*id.* at Page ID # 76]. She explained that she began experiencing medical problems in August of 2023 and "did not think of taking [Ms. McDermott] off," particularly considering Ms. McDermott had decided, "at the last minute," not to move in with Plaintiff because of the condition of the apartment Plaintiff had leased [*id.*].

Plaintiff secured counsel from Legal Aid of East Tennessee ("LAET")[3] for her informal appeal hearing, which took place on June 26, 2024 [Doc. 46 at Page ID # 866 (the "Appeal

[2] Defendant's counsel clarified during the Hearing that this was a reference to Plaintiff's refusal to sign the repayment agreement.

[3] LAET also represents Plaintiff in these proceedings. However, she is now represented by a different attorney from LAET.

Hearing")]. Joe Kelly, who serves as general counsel for Defendant, presided over the Appeal Hearing. After the Appeal Hearing concluded, Mr. Kelly granted Plaintiff's counsel's request for additional time to present additional evidence, which Plaintiff's counsel submitted by email on August 3, 2024 [*id.*; *see also* Doc. 1-24]. Mr. Kelly then issued the following written decision on August 19, 2024:

> Dear Ms. Randolph,
>
> You requested an informal hearing regarding the Notice of Termination from the Housing Choice Voucher Program (HCVP) dated April 30, 2024 for committing fraud in the amount of $12,251. Pursuant to the scheduling letter dated June 20, 2024, I conducted an appeal hearing on June 26, 2024, to consider your request.
>
> As background, a fraud investigation was opened into your household when you were flagged on HUD's Enterprise Income Verification discrepancy report. You then attended a fraud meeting where you were shown the evidence that two of your household members, Alexis McDermott and Brandon Linen, were contributing income to the household that had not been reported to the CHA in accordance with the requirements of the HCVP. You elected not to sign the repayment agreement and stated that Alexis McDermott never lived with you. You later provided to the fraud investigator . . . copies of two leases and a statement from your current landlord to show that Alexis had never moved in with you.
>
> You appeared for the hearing with your attorney, Anne Boatner. At the hearing, the fraud investigator informed us that the case was originally regarding the income of Alexis and Brandon, but that the majority of the balance is now due to your misrepresentation of household members and moving into a unit for which you were not qualified based on voucher size and HUD's maximum rent burden restrictions. When your attorney stated it was the CHA's fault for allowing you to lease into a unit that was too large for your household, the fraud investigator pointed out that Alexis was added as a household member on 7/17/23, was listed as a household member on the PDQ dated 9/18/23[4], and was not removed on the Change of Family Composition submitted on 10/12/23. Additionally, according to the fraud investigator findings, Alexis was never on the lease. I then requested that Ms. Boatner provide a timeline of events so that I could examine all facts of the case together.

---

[4] "PDQ" here refers to the September 2023 PDQ [Doc. 1-16 at Page ID # 63]. As mentioned earlier in this memorandum and opinion, Plaintiff actually completed the September 2023 PDQ on September 15, 2023, not September 18. [*See id.* at Page ID # 63–66]. The difference in dates does not affect the Court's analysis or decision in any way.

> Subsequent to the hearing, Ms. Boatner provided me with a timeline of your case and a summary of what she believed the issues with the case to be, primarily focused on live-in aide regulations and calculations. However, as it had already been established by your own testimony and multiple supporting documents that Alexis never lived with you in any capacity, the majority of this information was not relevant to the issues at hand. After reviewing the information provided by Ms. Boatner, as well as the case file in its entirety, I determined that you failed to report income and changes to household composition in accordance with the requirements of the Housing Choice Voucher Program, but you were eligible for the unit when accounting for Brandon Linen's unreported income. Had this information been reported in a timely and accurate manner, you would have qualified for a 2-bedroom voucher at your relocation to 2001 S Lyerly Street. The voucher size would have then decreased to a 1-bedroom at your November 2023 annual as you were the only household member at that time. Because you were issued a larger voucher than what you were entitled to, CHA applied artificially high payment standards and utility allowances, resulting in CHA's overpayment of subsidy.
>
> Based on the evidence presented to me, I find the failure to report Brandon Linen's income and the misrepresentation of the number of household members has resulted in a balance due back to the CHA in the amount of $7,723. Accordingly, your request for continued participation in the Housing Choice Voucher Program is **GRANTED** under the conditions that you enter into a repayment agreement and pay the required down payment of $3,724 by November 1, 2024.

[Doc. 1-25 (the "Appeal Decision")]. Plaintiff did not pay the $3,724 due on November 1, 2024, and Defendant terminated her participation in the Program [Doc. 46 at Page ID # 866].

Plaintiff then filed suit on August 18, 2025, and her complaint contains five counts:

> Count I: CHA violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by denying Ms. Randolph her right to receive a sufficient written pre-termination notice.
>
> Count II: CHA violated the Due Process Clause of the United States Constitution by failing to provide Ms. Randolph a grievance hearing in front of an impartial decision maker.
>
> Count III: Because the hearing decision did not include factual findings based upon a preponderance of the evidence introduced at the hearing, CHA violated its obligation to operate its [HCV] program in accordance with its own administrative plan.
>
> Count IV: CHA violated Ms. Randolph's right to consideration of mitigating circumstances if she failed to report income, and the August 19, 2024, hearing decision did not take into consideration any such mitigating circumstances or Ms.

> Randolph's documented disability.
>
> Count V: CHA violated Ms. Randolph's right to a meaningful opportunity to address any purported failure to report income in presenting her with a payment agreement on a "take-it-or-leave-it" basis, and which failed to account for her financial circumstances.

[Doc. 1 at Page ID # 12–16]. Plaintiff's counsel provided several clarifications during the Hearing. First, he represented that Plaintiff does not challenge the merits of the Appeal Decision. Rather, Plaintiff claims that Defendant violated her right to procedural due process, as required by the Fourteenth Amendment to the United States Constitution and under various public housing statutes, in the manner in which it terminated her participation in the Program. Second, he asserted that the gravamen of Plaintiff's claims is Counts I and II. Third, he stated that Plaintiff was not attacking the constitutionality of Defendant's procedures as a whole, but only as applied to Plaintiff.

In reliance upon those representations and the record as a whole, the Court now analyzes Defendant's motion for summary judgment.

## II. SUMMARY JUDGMENT

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that *matters*—i.e., a fact that, if found to be true, might "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *Jones v. Sandusky Cnty.*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). In determining whether a dispute is "genuine," the Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249.

Instead, the Court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports*, 253 F.3d at 907.

The moving party bears the initial burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.* at 323. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *Nat'l Satellite Sports*, 253 F.3d at 907.

## III. ANALYSIS

Applicable regulations provide that a Public Housing Authority ("PHA"), such as Defendant, may terminate an individual's or a family's assistance received in the Program if the individual or family "violates any family obligations under the program[,]" including the duty to supply "true and complete" information to the PHA. *See* 24 C.F.R. §§ 982.551(b)(2) and 982.552(c)(1)(i). Further, the PHA may terminate the assistance if the recipient owes rent or other amounts in connection with the program. *See* 24 C.F.R. §982.552(c)(1)(v).

There is no dispute that Plaintiff failed to provide true and complete information regarding Mr. Linen and Ms. McDermott's status as 24-hour live-in aides. There is no dispute that Plaintiff received overpayments based on her representations about Ms. McDermott, who undisputedly never moved in with Plaintiff. There is no dispute regarding the total amount of the overpayment. And there is no dispute that Defendant's guidance states that where a misrepresentation made by

a recipient results in an overpayment, the recipient's failure to repay or sign a repayment agreement constitutes grounds for termination. [*See* Doc. 36-3 at Page ID # 393]. Thus, the record undisputedly reflects that Plaintiff's misrepresentations led to an overpayment, and her subsequent failure to repay Defendant established grounds for termination.

What, then, is at issue on Defendant's motion for summary judgment? Plaintiff's counsel made clear during the Hearing that the *correctness* of Defendant's decision is not at issue. Rather, Plaintiff is challenging the *sufficiency of the procedures* Defendant utilized in coming to its ultimate decision. In response to Defendant's motion, Plaintiff provides three paragraphs of legal analysis and focuses her procedural attack on two issues. [*See* Doc. 45 at Page ID # 727–28]. First, Plaintiff argues that Defendant had never questioned Plaintiff's paperwork in the past and "if [Defendant] had any issue with her certification submissions, did nothing to address alleged discrepancies until at the earliest, 2023[,]" resulting in her "stated good-faith belief" that nothing was amiss [*id.* at Page ID # 727–28]. As mentioned above and discussed below, Plaintiff framed this issue as one concerning the sufficiency of the notice(s) Plaintiff received before the Appeal Hearing and before her Program voucher was terminated.[5] Second, Plaintiff argues that Mr. Kelly's involvement in and lack of more detailed record-keeping regarding the Appeal Hearing tainted the Appeal Decision. Neither argument is compelling, for the reasons set forth below.

[5] Plaintiff briefly made an estoppel-related argument during the Hearing, but she has not provided the Court with any authority to show why any prior decision of CHA would prevent them from properly terminating her assistance based on her continued listing of Ms. McDermott as a live-in aide and occupant, when Ms. McDermott never moved into an apartment with Plaintiff. Plaintiff also expressly conceded during the Hearing that her claims were not based on any action or inaction of CHA prior to the April 11 Letter.

### A. Sufficiency of Notices

Plaintiff argues that Defendant violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by denying Plaintiff her right to receive a sufficient written pre-termination notice.

Federal regulations require "prompt written notice that the family may request a hearing" addressing the decision to terminate assistance. *See* 24 C.F.R. § 982.555(c)(2). Similarly, Defendant's Administrative Plan for the Housing Choice Voucher Program (the "Administrative Plan") requires Defendant's notice to "[c]ontain a brief statement of the reasons for the decision[]" and "[s]tate if the family does not agree with the decision, the family may request an informal hearing on the decision within fifteen (15) days of the notification." [Doc. 36-4 at Page ID # 509].

The information contained in such notice must be sufficient to "enable participants the opportunity to prepare a defense," and "must only be 'sufficiently specific for it to enable an applicant to prepare rebuttal evidence to introduce at his hearing appearance.'" *Woods v. Willis*, 515 F. App'x 471, 479 (6th Cir. 2013) (internal citations omitted). The Court may also look to other circumstances beyond written notice. *Dogwood Apartments v. Hall*, No. 01-A-01-9209CV00334, 1993 WL 38004, at *3–4 (Tenn. Ct. App. Feb. 17, 1993) (oral and written notice, together with informal hearing prior to official termination hearing, precluded argument that notice was insufficient). There is no genuine issue of material fact regarding the existence and substance of any notice Defendant sent to Plaintiff. The Court therefore need only analyze whether such correspondence comports with the legal standards above.

In the April 11 Letter, Defendant provided Plaintiff with written notice of HUD's determination that she failed to report household income and requested a meeting to further discuss the matter [Doc. 1-18]. The April 11 Letter advised Plaintiff of a discrete issue (the failure to report

income) and provided details regarding the entities involved with that issue (Comprehensive Logistics and Blue Cross Blue Shield, which employed Mr. Linen and Ms. McDermott, respectively). The April 11 Letter then requested (but did not command) Plaintiff's presence at a meeting on April 22, 2024, invited her to bring any documents she wanted to review with Defendant, and provided contact information in the event she could not make the meeting. Plaintiff fails to explain how or why the notice provided by the April 11 Letter was deficient or otherwise violated Plaintiff's due process rights, especially given the fact it neither threatened nor purported to terminate Plaintiff's participation in the Program. Plaintiff's claims should therefore be dismissed to the extent they rely on the April 11 Letter.

Plaintiff then attended the meeting referenced in the April 11 Letter, during which she revealed to Defendant that Ms. McDermott—who Plaintiff had previously represented was a 24-hour live-in aide—had never actually lived in Plaintiff's apartment. Plaintiff then completed a change of family composition form that same day, removing Ms. McDermott and her children and noting that they "changed mind due to bugs/apt conditions." [Doc. 1-19]. On April 29, 2024, Defendant presented Plaintiff with a repayment agreement addressing the alleged overpayments resulting from her failure to report household income and incorrect representations regarding Ms. McDermott's occupancy [Doc. 1-21]. Plaintiff refused to sign the repayment form [*id.*]. Plaintiff fails to explain how this meeting or Defendant's subsequent presentation of a repayment agreement violated Plaintiff's due process rights. Therefore, Plaintiff's claims should be dismissed to the extent they rely on Defendant's conduct during the meeting on April 22, 2024, or on Defendant's presentation of a repayment agreement for Plaintiff's consideration on April 29, 2024.

That leads to what appears to be the crux of Plaintiff's due process claim, which was the Termination Notice [Doc. 1-20]. As noted above, the Termination Notice provides the following

information: (1) Plaintiff has "violated one or more of the Family Obligations"; (2) the violations are grounds for termination from the Program; (3) the violations are "failure to settle any debt owed" and "fraudulent act—unreported income[;]" (4) Defendant will terminate Plaintiff's participation in the Program effective May 31, 2024; (5) Plaintiff has 15 days to request an informal hearing challenging the decision using the hearing form on Defendant's website; and (6) Plaintiff may choose to be represented by counsel, produce witnesses, and cross-examine other witnesses during the hearing [*id.*].

The Court finds the Termination Notice sufficient under federal regulations, Defendant's Administrative Plan, and other applicable precedent. The document served as "prompt written notice that [Plaintiff] may request a hearing" and "[s]tate[d] that if [Plaintiff] does not agree with the decision, [she] may request an informal hearing on the decision within fifteen (15) days of the notification." *See* 24 C.F.R. § 982.555(c)(2); Doc. 36-4 at Page ID # 509. It contains "a brief statement of the reasons for the decision," which include both information discussed in the April 11 Letter (unreported income) and undisputedly addressed during the meeting on April 22, 2024 (debt related to overpayments stemming from the unreported income and Plaintiff's disclosure regarding Ms. McDermott) [Doc. 36-4 at Page ID # 509]. There is no genuine dispute that Plaintiff understood the basis for the Termination Notice, as reflected in her Request for an Informal Appeals Hearing, in which she stated her request was based on a disagreement with the amount of rent being charged (i.e., overpayments) and the circumstances surrounding her failure to remove Ms. McDermott from her household [Doc. 1-22].

In light of this record, the Court finds that the information in the Termination Notice was sufficient to "enable [Plaintiff] the opportunity to prepare a defense" and was "sufficiently specific for [Plaintiff] to prepare rebuttal evidence to introduce at [her] hearing appearance." *Woods*, 515

F. App'x at 479 (rejecting appellant's challenge to a notice of cancellation that stated she would be terminated for "fraud, in stating that you have custody of [D.W.]" without "identify[ing] the specific circumstances," "who she allegedly told," or "when she allegedly made the statement," because "the law does not require such detail."). Plaintiff's claims must therefore be dismissed to the extent they rely on the procedures leading up to the Appeal Hearing, including the notices Defendant provided.

**B. Sufficiency of the Appeal Hearing**

Plaintiff asserts Defendant violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to provide Plaintiff a grievance hearing in front of an impartial decision maker. Specifically, Plaintiff argues that Mr. Kelly's position as Defendant's general counsel, and his alleged failure to review notes related to the hearing, infected the fairness of the proceeding and ultimate decision:

> As for the June 26, 2024, hearing between Ms. Randolph and CHA's hearing officer, Mr. Kelly's position with CHA, no matter his evident good intent and extension of time to then-Plaintiff's counsel, cannot be described as that of an impartial hearing officer as CHA's general counsel. Acting as both an advocate and adviser to CHA while hearing grievance hearings lodged against the same organizational body is inherently a conflict. That he made his decision in Plaintiff's case without the benefit of reviewing his associate general counsel's notes, assuming they exist in this matter, is all the more reason to question the efficacy of his August 19, 2026, decision.

[Doc. 43-1 at Page ID # 583]. As always, the Court begins its analysis with the pertinent law.

Federal regulations require a participant be given an opportunity to examine evidence upon request, be represented by a lawyer at their own expense, and question witnesses and present evidence at the hearing. 24 C.F.R. § 982.555(e). Plaintiff does not allege, and the record does not reflect, that she was denied any of those opportunities prior to or during the Appeal Hearing. Further, the record demonstrates that Plaintiff requested and was granted an opportunity to submit

additional information after the Appeal Hearing, and that Mr. Kelly reviewed such information before rendering the Appeal Decision. The Court therefore finds that insofar as Plaintiff's claims assert a violation of her participation rights during the Appeal Hearing, Defendant is entitled to judgment as a matter of law.

That leaves what appears to be the gravamen of Plaintiff's complaint, which is that Mr. Kelly could not have been an impartial decision maker because he served as Defendant's general counsel. When analyzing due process issues, "agencies are provided the benefit of the doubt with regard to impartiality." *Woods*, 515 F. App'x at 480. That benefit comes with a "presumption of honesty and integrity in those serving as adjudicators[,]" and, as Plaintiff concedes, to ultimately prevail on her claim, she "has a heavy burden to shoulder, one that is not met with a mere showing that the agency served as both a 'prosecutor' and 'judge.'" *Id.*[6] Plaintiff cannot satisfy that burden unless she demonstrates that Mr. Kelly's adjudicative and investigative powers pose "such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Woods*, 515 F. App'x at 480.

Federal regulations provide that "[t]he hearing may be conducted **by any person** or persons designated by the PHA, **other than a person who made or approved the decision under review or a subordinate of this person**." 24 C.F.R. § 982.555(e)(4)(i) (emphasis added). Similarly, Defendant's Administrative Plan requires the hearing officer be someone other than the person "who made or approved the decision under review or a subordinate of this person." [Doc. 36-4 at Page ID # 507]. There is no dispute that Mr. Kelly did not make or approve the decision to

[6] The United States Court of Appeals for the Sixth Circuit has held that "based on Supreme Court precedent, one claiming bias in administrative adjudication has a heavy burden to shoulder." *Cobb v. Yeutter*, 889 F.2d 724, 730 (6th Cir. 1989). "In all such settings, the same agency will necessarily serve both as prosecutor and judge. This, in and of itself, is not enough to make out a due process violation." *Id.*

terminate Plaintiff's participation in the Program. Nor was he a subordinate of the decisionmaker. And it is undisputed that Mr. Kelly's first substantive involvement in the decision-making process was the day before the Appeal Hearing, when he initially reviewed the file [Doc. 43-3 at Page ID # 672–73; 690–91].

Plaintiff does not cite any authority supporting her argument that Mr. Kelly's involvement tainted the Appeal Hearing or otherwise deprived her of due process. Nor does the record support such an assertion. There is no allegation that Mr. Kelly acted in anything but an appropriate and objective manner, and even when the record is viewed in the light most favorable to Plaintiff and all reasonable inferences are made in her favor, the Court finds there is no evidence of *any* bias, let alone enough sufficient to overcome the heavy burden Plaintiff carries in these circumstances. Indeed, Mr. Kelly afforded Plaintiff ample opportunity *after* the Appeal Hearing to submit *additional* argument and evidence. The Court therefore finds that Mr. Kelly's role as CHA's general counsel, without more, is insufficient to support Plaintiff's claims.

Finally, Plaintiff argues that the Appeal Decision was not properly documented. Federal regulations provide the requirements of a decision on hearing:

> The person who conducts the hearing must issue a written decision within 14 calendar days from the date of the hearing, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing.

24 C.F.R. § 982.555(e)(6). Defendant's Administrative Plan contains nearly identical language, but adds a requirement that the written decision be issued within 14 days from the date of the hearing. [Doc. 36-4 at Page ID # 510]. Again, the record reflects Mr. Kelly complied with these requirements, with one exception—Mr. Kelly did not issue a written decision within 14 days, because he granted Plaintiff's request for additional time to submit further evidence.

Plaintiff argues that the Appeal Decision is nonetheless tainted because Mr. Kelly did not have a court reporter present or review his associate general counsel's notes before writing it, and his failure to do either of these things "is all the more reason to question the efficacy of his August 19, 2026, decision." [Doc. 45 at Page ID # 729]. But Plaintiff does not cite any authority holding that an adjudicator's mere failure to reference notes before issuing a decision is a due process violation. Further, the Court finds that Mr. Kelly's testimony provides a thorough summary of his recollection of what appears to have been a straightforward hearing:

> Q: Given what you recall about the hearing you say that lasted 10 to 15 minutes, were the facts necessarily simple such that you could make an immediate determination?
>
> A: I did not make an immediate determination in that hearing. During the hearing—I understood and I announced this at the beginning of the hearing when Ms. Boatner came in with Ms. Randolph—that my understanding, that this was an unreported income case and that there was an issue about outside income being unreported by the son and then an issue with a person being listed as a live-in aide who never lived in the unit.
>
> And Ms. Boatner agreed that that was the issue and I think made a statement to the effect of that is—because I think I said one of the issues is that having a person listed as a live-in aide who never actually lived there meant that Ms. Randolph was put into a larger unit than she otherwise qualified for and CHA overpaid subsidy. That was my understanding.
>
> And I typically do that at a hearing to say this is what I think we're talking about to give anybody a chance to say, oh, no, that's not what I thought I was here for. But Ms. Boatner agreed. I think she made the statement—something to the effect that that was all CHA's fault for putting her in the larger unit and CHA should have known better.
>
> There was no testimony at that time from Ms. Randolph. I asked Sarah Pennington to—who was the fraud investigator—to outline her findings of what happened. She went through that case.
>
> One of the salient facts that I just remember off the top of my head was that this started as an EIV notification of unreported income. And at the initial meeting, it was—it was—Ms. Pennington was told by Ms. Randolph that her niece, Ms.—and I am so sorry I cannot remember her name—the live-in aide, that's Mrs. . . . McDermott. Ms. McDermott. I am so sorry. Ms. McDermott. That Ms. McDermott

> had never lived in the unit. And so that had become a topic of conversation during that meeting. That was part of the evidence that Ms. Pennington presented.
>
> When Ms. Pennington concluded, I don't recall that Ms. Boatner asked any questions. I asked one question for Ms. Randolph, which was had Ms. McDermott ever lived in the unit, because I wanted to confirm from Ms. Randolph whether that person had ever lived there or not rather than just hearing from the fraud investigator. Ms. Randolph confirmed that she had never lived there.
>
> At that point, I asked if there was anything else. Ms. Boatner said she would like to follow up with—to review the file some more and provide follow-up information and a timeline. I said that was—it's my practice to keep the hearing open if someone has further information. I said that was fine and that I would keep it open until she provided me the additional information. And if she wanted to reopen the hearing and have more testimony, that's fine too. And that was it for that day.
>
> The next time I heard anything about the case was early August. So about a little over a month later, we received—I received an email from Ms. Boatner that had a timeline and her position on a number of the issues. The email primarily concerned itself, in my read, with whether or not it was proper to—proper calculation of Ms. McDermott's income in the process. And I think as I reflected in my hearing letter, I did not feel that was relevant since Ms. McDermott had never lived in the unit. That was more of the issue to me. And there—that may have been way more than you wanted.

[Doc. 43-3 at Page ID # 694–97].

Plaintiff does not challenge the accuracy of Mr. Kelly's testimony. Nor does she point to any argument or evidence presented during the Appeal Hearing that Mr. Kelly failed to address in the Appeal Decision. Rather, Plaintiff argues that Mr. Kelly "made no findings of fact in his decision letter **with respect to any mitigating factors as context** in [Plaintiff's] purported failure to timely report family composition changes even though she raised such factors when she filed her appeal of the April 30, 2024, notice of termination of voucher." [Doc. 45 at Page ID # 725 (emphasis added)]. The Court assumes Plaintiff here refers to the "mitigating circumstances . . . explaining why she did not take immediate action to remove her live-in aide and other occupants due to her medical condition commencing in August 2023, and as the result of her condition, she

forgot to remove them." [Doc. 45 at Page ID # 724]. The record reflects that this condition was an event leading to Plaintiff spending 24 hours in the emergency room in August of 2023, after her first representation regarding Ms. McDermott, and well before her second and third misrepresentations [Doc. 43-2 at Page ID # 640–41]. There is no dispute that Mr. Kelly was aware of and considered these circumstances, which were also raised in the post-Appeal Hearing email from Plaintiff's counsel. Mr. Kelly nonetheless found that the circumstances described in the post-Appeal Hearing email "were not relevant to the issues at hand." [Doc. 1-25]. Plaintiff does not cite any authority suggesting that Mr. Kelly's failure to discuss the circumstances in more detail in his written decision amounts to a constitutional violation.

And Mr. Kelly directly addressed in the Appeal Decision Plaintiff's assertion regarding Defendant's lack of prior action: "When your attorney stated it was [Defendant's] fault for allowing you to lease into a unit that was too large for your household, the fraud investigator pointed out that [Ms. McDermott] was added as a household member on 7/17/23, was listed as a household member on the PDQ dated 9/18/23, and was not removed on the Change of Family Composition submitted on 10/12/23." [Doc. 1-25 at Page ID # 85].

At bottom, Plaintiff asks the Court to send this case to a jury solely because Mr. Kelly based the Appeal Decision on his recollection of the Appeal Hearing and Plaintiff's counsel's email following the Appeal Hearing. Again, Plaintiff does not cite any authority supporting her position, which the Court respectfully cannot endorse at this late stage of the proceedings. Plaintiff has not demonstrated the existence of any disputed facts that are material to any of her claims. Rather, the undisputed material facts reflect that Defendant is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's motion for summary judgment [Doc. 34] as to all of Plaintiff's claims. The Court therefore **DENIES** Defendant's motion in in limine [Doc. 49] as **MOOT**. The telephonic final pretrial conference set for January 20, 2027, and the trial date of February 10, 2027, are **CANCELED**. This case is **DISMISSED**, and the Court will enter judgment in favor of Defendant.

SO ORDERED.

ENTER:

/s/

MIKE DUMITRU
UNITED STATES MAGISTRATE JUDGE